COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-08-034-CV

 

 

IN THE INTEREST OF J.R.S, J.L.S.,                                                         

AND B.L.N.S.

 

 

 

                                              ------------

 

              FROM THE 90TH DISTRICT COURT OF YOUNG COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

                                          I.  Introduction








Appellant Melissa S. appeals the trial court=s
judgment terminating her parental rights to her three childrenCJulia,
James, and Bethany (collectively Achildren@).[2]  Melissa argues that the trial court erred by
failing to grant her motion for continuance, that the evidence is legally and
factually insufficient to support the trial court=s family
code section 161.001(1) termination ground findings, and that the evidence is
legally and factually insufficient to support the trial court=s
finding that termination of Melissa=s
parental rights to the children is in the children=s best
interest.  We affirm.

                          II.  Factual and Procedural Background

At age fifteen, Melissa gave birth to Julia.  Melissa lived with her mother in Indiana when
Julia was born.  Melissa last saw Julia=s
father, Enrique O., when she was pregnant with Julia.  Melissa signed a provisional custody
agreement that allowed her mother to make various decisions for Julia, who was
diagnosed with epilepsy at age five. 
Julia was sixteen years old at the time of trial.

Melissa was sixteen year=s old
when she, Julia, and Melissa=s mother
moved to Louisiana.  There, still at age
sixteen, Melissa met and married George G. 
Melissa subsequently separated from George G., moved to Dallas, met Beto
M., had a two-year relationship with Beto, and gave birth to James in July 1995
in Louisiana.[3]  Melissa learned after James=s birth
that George had divorced her.  Melissa is
unaware of Beto=s whereabouts.  James was twelve years old at the time of
trial.








Melissa moved back to Dallas about a year after
James=s
birth.  Julia and James remained in the
care of Melissa=s mother.  In November 1997, Melissa gave birth to her
third child, Bethany, back in Louisiana. 
At trial, Melissa could not articulate Bethany=s father=s name,
nor did she know what he did for a living, despite claiming to have had a
two-year relationship with him.  Bethany
was ten years old at the time of trial.

Melissa never graduated from high school.  She lived with her mother in Louisiana after
Bethany was born.  She did not have a
job, but she drew SSI benefits and received WIC payments and Medicaid.  Approximately four years after Bethany=s birth,
Melissa moved back to Texas Ato live
on her own,@ and she worked as a
waitress.  Julia, James, and Bethany
remained in Louisiana under Melissa=s mother=s
care.  Melissa left the children in her
mother=s care
because Melissa did not have the means to take care of them, and she knew that
they would have a roof over their heads. 
Melissa visited the children and sent them money.








After living in Dallas for approximately eighteen
months, Melissa moved back to Louisiana to live with her mother because her
mother was sick and she needed help caring for Julia.[4]  Melissa did not have a job when she moved
back to Louisiana.

In October 2002, Melissa=s mother
and the children moved to Graham, Texas, to live with Vickie and Lester M.[5]
because Melissa=s mother was sick and needed
care.  Melissa had last signed a
provisional custody agreement in 2001, and she was Apissed@ about
the move because she Adidn=t have a
say at all@ in her mother=s
decision to move to Texas with the children. 
Melissa called Legal Aid and the Sheriff=s
Department for assistance.  However, she
never went to Texas to pick up the children, and she eventually Alet it
go@ because
she Aknew
[her] mom could take care of [the children]. 
They were in good hands.@  Melissa moved to Dallas two weeks later.  Melissa visited the children in December
2002.








Melissa=s mother
died in March 2003.  Thereafter, Vickie
and Lester M. filed suit, and the trial court signed an order in September 2003
that appointed them and Melissa joint managing conservators of the children and
gave Vickie and Lester M. the exclusive right to designate the primary
residence of the children within Young County. 
Vickie and Lester M. had care, custody, and control of the
children.  The order also required Melissa
to pay to Vickie and Lester M. monthly child support in the amount of $100, and
it awarded Melissa monthly visitation with the children.  Melissa did not make the child support
payments.

After entry of the order, Melissa visited the
children in July 2004, December 2004, and July 2005.  She had little or no transportation that allowed
her to visit the children.  Vickie M.
told her that she could not see the children, and Melissa did not have enough
money to hire an attorney to represent her interests regarding the children.  Melissa, however, never moved to Graham to be
close to her children.  According to her,
AI didn=t want
to [move to Graham].  I wanted to live
elsewhere.@








Appellee, the Texas Department of Family and
Protective Services (ATDFPS@),
removed the children from Vickie and Lester M.=s
residence on August 3, 2006, after Vickie M.Cclaiming
that she was having trouble controlling them and that she could not handle them
anymoreCdelivered
the children to TDFPS.  Following an
investigation, TDFPS found that there was Areason
to believe@ for physical abuse and for the
refusal of parental responsibility.[6]  Melissa admitted that when Vickie M. turned
the children over to TDFPS, Melissa Adid not
have the means of a living, no, I did not. 
And I did not want them [the children] in my possession at the time
anyway because I didn=t have nowhere else to put them
as far as household.@

Melissa participated with TDFPS to develop a
service plan.  She took a psychological
exam early in the case, but she did not complete her plan (which included
taking another psychological exam and completing parenting classes and
counseling sessions) until the latter part of 2007, after an extension.

After the children=s
removal, Melissa moved to Houston in January 2007; she moved to Irving in late
February 2007; she moved to Oklahoma in March, April, or May 2007; and she moved
back to Irving in July 2007.  Melissa
visited the children once in October 2006 and once in December 2007.[7]  She failed to show up for visits with the
children on February 1, 2007, and September 11, 2007, and she contended that
the trial court prohibited her from visiting the children from late February
2007 to June 2007.

Trial was to the bench in January 2008.  Melissa testified that she lives with Cheryl
S. (her Agodmother@), that
she had started working at a restaurant three months before trial, and that she
had applied for housing with the Dallas Housing Authority, but she acknowledged
that she does not have transportation and that she does not have a place for
the children to live.








The trial court subsequently signed an order
terminating Melissa=s parental rights to Julia,
James, and Bethany.[8]  The trial court found by clear and convincing
evidence that termination of Melissa=s
parental rights to the children was in the children=s best
interest and that Melissa had (1) knowingly placed or knowingly allowed the
children to remain in conditions or surroundings that endangered their physical
or emotional well-being, (2) engaged in conduct or knowingly placed the
children with persons who engaged in conduct that endangered the children=s
physical or emotional well-being, (3) constructively abandoned the children,
and (4) failed to comply with the provisions of a court order that specifically
established the actions necessary for her to obtain the return of the children.  See Tex. Fam. Code Ann. '' 161.001(1)(D),
(E), (N), & (O), 161.001(2) (Vernon 2008). 
The trial court further ordered that TDFPS be appointed permanent
managing conservator of the children. 
This appeal followed.

                                  III.  Motion for Continuance








In her first issue, Melissa argues that the trial
court erred by failing to grant her motion for continuance.  She contends that she did not receive proper
notice of the final trial setting as required by Texas Rule of Civil Procedure
245 because neither she nor her attorney were present at an October 5, 2007
permanency hearing when the first notice of the final trial setting was made
and because her attorney, who she states was appointed on December 11, 2007,
did not receive notice Auntil some date in December
after December 11, 2007.@

Rule 245 provides in part as follows: 

The Court may set
contested cases on written request of any party, or on the court=s own motion, with
reasonable notice of not less than forty-five days to the parties of a first
setting for trial, or by agreement of the parties; provided, however, that when
a case previously has been set for trial, the Court may reset said contested
case to a later date on any reasonable notice to the parties or by agreement of
the parties.

 

Tex. R. Civ. P. 245.  The
forty-five day notice provision is mandatory. 
Custom-Crete, Inc. v. K-Bar Servs., Inc., 82 S.W.3d 655, 659
(Tex. App.CSan Antonio 2002, no pet.).  But it applies only to the first setting of
the trial.  State Farm Fire & Cas.
Co. v. Price, 845 S.W.2d 427, 431B32 (Tex.
App.CAmarillo
1992, writ dism=d).  Whether the trial court grants or denies a
motion for continuance is within its sound discretion.  See BMC Software Belg., N.V. v. Marchand,
83 S.W.3d 789, 800 (Tex. 2002).  A trial
court abuses its discretion if it acts in an arbitrary or unreasonable manner,
without reference to guiding rules and principles.  Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 241B42 (Tex. 1985), cert. denied,
476 U.S. 1159 (1986).








The trial court signed a permanency hearing order
on June 22, 2007, that set October 5, 2007, as the final trial date.  The order indicates that Melissa Aappeared
in person and announced ready.@  On October 5, 2007, the trial court signed a
permanency hearing order that reset the final trial date for January 14,
2008.  The order does not indicate that
Melissa was present.  On October 24,
2007, the trial court signed an order appointing Jeff Eaves to represent
Melissa.  Melissa states in her brief
that her lawyer did not receive notice of the termination matter Auntil
some time in December after December 11, 2007.@  The termination trial commenced on January
14, 2008.








Because June 22, 2007, was not less than
forty-five days before January 14, 2008, Melissa received notice of the first
trial setting as required by rule 245. 
See Tex. R. Civ. P. 245. 
Assuming that Melissa=s
counsel received notice of the reset final trial setting Asome
date in December after December 11, 2007,@ and
considering the entire record, Melissa received reasonable notice of the
January 14, 2008 reset final hearing as required by rule 245.  See id.[9]  Accordingly, we hold that the trial court did
not abuse its discretion not granting Melissa=s motion
for continuance.  We overrule Melissa=s first
issue.

                                  IV.  Evidentiary Sufficiency

In her second, third, fourth, fifth, and sixth
issues, Melissa argues that the evidence is legally and factually insufficient
to support the trial court=s family
code section 161.001(1) termination ground findings and section 161.001(2) best
interest finding.

A.     Standard of Review








A parent=s rights
to Athe
companionship, care, custody, and management@ of his
or her children are constitutional interests Afar more
precious than any property right.@  Santosky v. Kramer, 455 U.S. 745, 758B59, 102
S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex.
2003).  AWhile
parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to
recognize the constitutional underpinnings of the parent-child relationship, it
is also essential that emotional and physical interests of the child not be sacrificed
merely to preserve that right.@  In re C.H., 89 S.W.3d 17, 26 (Tex.
2002)6.  In a termination case, the State
seeks not just to limit parental rights but to erase them permanentlyCto
divest the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right
to inherit.  Tex. Fam. Code Ann. '
161.206(b) (Vernon 2008); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.
1985).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Holick,
685 S.W.2d at 20B21; In re M.C.T., 250 S.W.3d
161, 167 (Tex. App.CFort Worth 2008, no pet.).

In proceedings to terminate the parent‑child
relationship brought under section 161.001 of the family code, the petitioner
must establish one ground listed under subdivision (1) of the statute and must
also prove that termination is in the best interest of the child.  Tex. Fam. Code Ann. '
161.001; In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established; termination
may not be based solely on the best interest of the child as determined by the
trier of fact.  Tex. Dep=t of
Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987).








Termination decisions must be supported by clear
and convincing evidence.  Tex. Fam. Code
Ann. ''
161.001, 161.206(a).  Evidence is clear
and convincing if it Awill produce in the mind of the
trier of fact a firm belief or conviction as to the truth of the allegations
sought to be established.@ 
Id. ' 101.007 (Vernon 2002).  Due process demands this heightened standard
because termination results in permanent, irrevocable changes for the parent
and child.  In re J.F.C., 96
S.W.3d 256, 263 (Tex. 2002); see In re J.A.J., 243 S.W.3d 611,
616 (Tex. 2007) (contrasting standards for termination and modification).

In reviewing the evidence for legal sufficiency
in parental termination cases, we must determine whether the evidence is such
that a factfinder could reasonably form a firm belief or conviction that the
grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005). 
We must review all the evidence in the light most favorable to the
finding and judgment.  Id.  This means that we must assume that the
factfinder resolved any disputed facts in favor of its finding if a reasonable
factfinder could have done so.  Id.  We must also disregard all evidence that a
reasonable factfinder could have disbelieved. 
Id.  We must consider,
however, undisputed evidence even if it is contrary to the finding.  Id. 
That is, we must consider evidence favorable to termination if a
reasonable factfinder could and disregard contrary evidence unless a reasonable
factfinder could not.  Id.








We must therefore consider all of the evidence,
not just that which favors the verdict.  Id.
 But we cannot weigh witness
credibility issues that depend on the appearance and demeanor of the witnesses,
for that is the factfinder=s
province.  Id. at 573, 574.  And even when credibility issues appear in
the appellate record, we must defer to the factfinder=s
determinations as long as they are not unreasonable.  Id. at 573.

In reviewing the evidence for factual
sufficiency, we must give due deference to the factfinder=s
findings and not supplant the judgment with our own.  In re H.R.M., 209 S.W.3d 105, 108
(Tex. 2006).  We must determine whether,
on the entire record, a factfinder could reasonably form a firm conviction or
belief that the parent violated the relevant conduct provision of section
161.001(1) and that the termination of the parent-child relationship would be
in the best interest of the child.  C.H.,
89 S.W.3d at 28.  If, in light of the
entire record, the disputed evidence that a reasonable factfinder could not
have credited in favor of the finding is so significant that a factfinder could
not reasonably have formed a firm belief or conviction in the truth of its
finding, then the evidence is factually insufficient.  H.R.M., 209 S.W.3d at 108.

B.     Constructive Abandonment Finding








A parent constructively abandons a child when (1)
the child has been in the permanent or temporary managing conservatorship of
TDFPS or an authorized agency for not less than six months, (2) TDFPS or the
authorized agency has made reasonable efforts to return the child to the
parent, (3) the parent has not regularly visited or maintained significant
contact with the child, and (4) the parent has demonstrated an inability to
provide the child with a safe environment. 
Tex. Fam. Code Ann. ' 161.001(1)(N);
In re A.S., 261 S.W.3d 76, 88B89 (Tex.
App.CHouston
[14th Dist.] 2008, pet. denied).  The
only constructive abandonment requirement Melissa challenges is the requirement
that TDFPS make reasonable efforts to return the children to her.  As TDFPS points out, this court and others
have reasoned that TDFPS=s preparation and administration
of a service plan for the parent constitutes evidence that TDFPS made
reasonable efforts to return the child to the parent.  See, e.g., In re K.M.B., 91 S.W.3d 18,
25 (Tex. App.CFort Worth 2002, no pet.); In
re S.S., No. 11-05-00083-CV, 2006 WL 1285125, at *2B3 (Tex.
App.CEastland
May 11, 2006, no pet.) (mem. op.).








The record demonstrates that Melissa participated
with TDFPS to develop a service plan.  She
signed the AFamily Service Plan@ on
October 25, 2006.  The service plan
specifically states that its Apurpose
is to help you provide your child with a safe environment within the reasonable
period specified in the plan.@  It further states that TDFPS (CPS) will
evaluate Melissa=s progress on the basis of
Melissa=s Asuccessful
achievement of the goals stated in this plan,@ Asuccessful
completion of the tasks in this plan,@ and Aability
to provide for the ongoing safety and well-being of your children.@  The service plan required that Melissa
complete parenting classes, a psychological evaluation, counseling sessions,
and drug screens.  On October 27, 2006,
the trial court signed a status hearing order providing in part that the
service plan is reasonable, accurate, and in compliance with the previous
orders of the court and, significantly, that the plan Aadequately
ensure[s] that reasonable efforts are being made to enable the parent to
provide a safe environment for the children.@








Melissa argues that TDFPS Adid not
make reasonable efforts to assist [her] with her transportation issues in an
effort to facilitate her visitation with the children, nor did [TDFPS] assist
her in an effort to make the visitation take place at a location more
accessible to Melissa.@ 
But April Mancilla, the CPS caseworker assigned to Melissa=s case,
testified that Melissa never requested transportation services from TDFPS.  Mancilla also testified that Melissa did not
notify her of the approximately six moves that Melissa made during the pendency
of the case, that it was difficult to locate Melissa, and that it was difficult
to work with Melissa with regard to her performing services.  Mancilla stated that TDFPS offered services
early in the case, but Melissa did not complete her services until the latter
part of 2007.  According to Mancilla,
Melissa expressed throughout the whole case that she wanted to place her
children with her sister, who lives in Louisiana.  It was not until October 2007 that Melissa Adecided
that she was going to work services.@

Additionally, Melissa testified that she
accomplished many of her moves and visited her children when living away from
them with the help of friends, by taking a Greyhound bus, or by driving her own
car when she owned it.  She testified:

[TDFPS attorney]:  So you were able to get transportation when
you needed to get transportation?

 

[Melissa]: 
Yes.

The decision to not live closer to her children was Melissa=s
decision.  According to her, she never
moved to Graham to be close to her children because she Adidn=t want
to [move to Graham].  [She] wanted to
live elsewhere.@

Based on our review of the entire record, we
conclude that a factfinder could reasonably have formed a firm belief or
conviction that TDFPS made reasonable efforts to return the children to
Melissa.  Therefore, we hold that the
evidence is legally and factually sufficient to support the trial court=s
section 161.001(1)(N) finding that Melissa constructively abandoned her
children.  See Tex. Fam. Code Ann.
' 161.001(1)(N).  We overrule Melissa=s fourth
issue.








Because we affirm the trial court=s
section 161.001(1)(N) finding, we need not address Melisssa=s
second, third, and fifth issues challenging the sufficiency of the evidence to
support the trial court=s section 161.001(1)(D), (E),
and (O) findings.  See In re A.V.,
113 S.W.3d 355, 362 (Tex. 2003) (providing that only one predicate finding
under section 161.001(1) is necessary to support a judgment of termination when
there is also a finding that termination is in the child=s best
interest).

C.     Best Interest Finding

There is a strong presumption that keeping a
child with a parent is in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child=s best interest.  Tex. Fam. Code Ann. '
263.307(a) (Vernon 2002).  Nonexclusive
factors that the trier of fact in a termination case may use in determining the
best interest of the child include:

(A)    the desires of the child;

(B)    the
emotional and physical needs of the child now and in the future

 

(C)    the emotional and physical danger to the
child now and in the future;

(D)    the parental abilities of the individuals
seeking custody; 








(E)    the programs available to assist these
individuals to promote the best interest of the child;

(F)     the plans for the child by these
individuals or by the agency seeking custody;

(G)    the
stability of the home or the proposed placement;

 

(H)    the
acts or omissions of the parent which may indicate that the existing parent‑child
relationship is not a proper one; and

 

(I)     any
excuse for the acts or omissions of the parent.

 

Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex.
1976).  These factors are not exhaustive;
some listed factors may be inapplicable to some cases; other factors not on the
list may also be considered when appropriate. 
C.H., 89 S.W.3d at 27. 
Furthermore, undisputed evidence of just one factor may be sufficient in
a particular case to support a finding that termination is in the best interest
of the child.  Id.  On the other hand, the presence of scant
evidence relevant to each factor will not support such a finding.  Id.








Here, Julia informed the trial court that she
thought Melissa should Aget her rights to us [the children],@ that
she would feel safe living with Melissa, and that she would be happiest if the
judge A[p]ut me
back with my mama.@ 
James told the trial court that he wanted to live with Melissa because
he has not lived with her in a long time. 
Melissa offered into evidence two notes from the children.  They state, among other things, AHope you
stay away from smoking and I hope that you come through with your services and
I hope you get us back,@ AI love
you and miss you and want to go home with you,@ AYour
loving children forever,@ and AWe love
you, Mommy.@

Melissa testified that she has taken steps to
become a responsible parent, including getting a job, applying for housing, and
trying to work something out for transportation.  Melissa opined that she is able to both
physically and emotionally take care of the children, that Athis
process@ has
matured her, that she relates with her children well, and that her godmother
provides her with a support system.








Mancilla, however, opined that it is in the
children=s best
interest that Melissa=s parental rights be
terminated.  She testified that the
children need stability, permanency, and consistency; that they need a home
that they can go to; and that they need to have food to eat.  Mancilla thought that Melissa had not
developed the parenting skills and abilities necessary to take care of the
three children.  She testified that
Melissa did not currently have a clean and safe environment for the children to
live in, that Melissa did not demonstrate to TDFPS that the choices she had
been making were good choices, that she had no indication from Melissa=s
testimony that Melissa is emotionally stable, that Melissa could not adequately
take care of the emotional and physical needs of the children, that she does
not think that Melissa will get the children to the doctor=s office
when they need to go, and that she does not think that Melissa has the
parenting ability to parent the children. 
Melissa acknowledged that she does not have transportation and that she
does not have a place for the children to live. 

Mancilla agreed that Melissa has made numerous
excuses for her behavior instead of taking responsibility for her actions,
including that Melissa had a drunk father, that she became pregnant at age
fifteen and eighteen, that she was kicked out of school at age fifteen, that
she has no transportation and no home, and that she lives on disability.

Mancilla testified that all three of the children
are doing Agreat@ and
that they are comfortable in their current placements.  She agreed that the children have never had a
consistent caregiver and that the last year and one-half (the pendency of
Melissa=s case)
has probably provided the children with the most consistent care that they have
ever had.

Frank Gellner is the guardian ad litem for the
children.  He visited the children at
least every three months during his tenure as guardian ad litem.  He agreed that Julia, the eldest sibling,
felt like she was the Amother figure@ in the
lives of her two siblings.  Gellner did
not think that it would be a good idea to return the children to Melissa, and
he recommended that Melissa=s
parental rights be terminated.








The factorsCincluding
the emotional and physical needs of the children now and in the future, the
emotional and physical danger to the children now and in the future, Melissa=s
parental abilities, the stability of the home, and Melissa=s
excuses for her acts or omissionsCsupport
the trial court=s finding that termination of
the parent-child relationship is in the children=s best
interest.  See Holley, 544 S.W.2d
at 371B72.

Based on our review of the entire record, we
conclude that a factfinder could reasonably have formed a firm belief or
conviction that termination of Melissa=s
parental rights to Julia, James, and Bethany is in Julia=s, James=s, and
Bethany=s best
interest.  Therefore, we hold that the
evidence is legally and factually sufficient to support the trial court=s
section 161.001(2) best interest finding. 
See Tex. Fam. Code Ann. ' 161.001(2).  We overrule Melissa=s sixth
issue.

                                          V.  Conclusion

Having overruled Melissa=s first,
fourth, and sixth issues, her dispositive issues, we affirm the trial court=s order
terminating Melissa=s parental rights to Julia,
James, and Bethany.

 

BOB
MCCOY

JUSTICE

PANEL: GARDNER, WALKER, and MCCOY, JJ.

DELIVERED: February 5, 2009











[1]See Tex. R. App. P. 47.4.





[2]Pursuant to Texas Rule of
Appellate Procedure 9.8(b)(2), we use aliases for the names of the children.





[3]James, who is Beto=s son, was born two and
one-half months premature, weighing approximately two pounds, thirteen ounces.





[4]Julia suffered seizures.





[5]Lester M. is Melissa=s uncle.





[6]Melissa testified that
she heard family violence involving one or more of the children occurred at
Vickie and Lester M.=s residence.





[7]Melissa did not visit the
children between July 2005 and October 2006.





[8]The trial court also
terminated the parental rights of all three of the alleged fathers of the
children.





[9]We note that the record
demonstrates that the trial court signed an order on October 5, 2007,
consolidating the termination case with an action seeking to recover Melissa=s child support arrearage
under cause number 29,907.  Melissa=s attorney appeared on
behalf of Melissa in cause number 29,907 as early as November 14, 2007, two
months before the final trial.